Filed 6/20/13  P. v. Gallegos CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODOLFO GALLEGOS,<br><br>    Defendant and Appellant. | B238571<br><br>(Los Angeles County<br>Super. Ct. No. BA303189)<br><br>**ORDER MODIFYING OPINION**<br>**NO CHANGE IN JUDGMENT** |

THE COURT:


It is ordered that the opinion filed herein on June 17, 2013, and not certified for publication, be modified as follows:


1.  On the title page, the superior court number was erroneously listed as "**MA047368**."  It should read:  "**BA303189**."


The foregoing does not change the judgment.


**PERLUSS, P. J.**                              **ZELON, J.**

Filed 6/17/13 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODOLFO GALLEGOS,<br><br>    Defendant and Appellant. | B238571<br><br>(Los Angeles County<br>Super. Ct. No. MA047368) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bob S. Bowers Jr., Judge. Affirmed with directions.

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1991, gang member Rodolfo Gallegos (then 16) shot at five people, killing one of them. After admitting the shooting to others, he fled to Mexico but was apprehended and tried nearly 20 years later.

A jury convicted Gallegos of one count of first degree murder and four counts of attempted premeditated murder and found true related gang and firearm allegations. The trial court sentenced Gallegos to state prison for a term of 85 years to life on the murder and four attempted murder counts plus another 5 years for the firearm enhancement.

Gallegos appeals, claiming insufficiency of the evidence as well as various evidentiary errors and sentencing error. We affirm the convictions but remand for resentencing.

## *FACTUAL AND PROCEDURAL SUMMARY*

On Friday, August 23, 1991, several friends (Johnnie Nieto, Felipe Curiel, Canea Rowan (also known as Robin Rowan), Ruben Perez and Kenny Caldera) attended a party. Later, another guest at the party (Reinaldo Morales) agreed to drive the friends home, and the group left at about 1:00 a.m. (on August 24). After dropping off Curiel, Morales stopped at a red light. Another car pulled up on the right, and someone inside that car yelled, "Where are you from?" Rowan screamed, "We are from nowhere," and urged Morales, "Go, go, go." Within seconds, the passenger in the second car who was holding a gun (later identified as Rodolfo Gallegos) leaned over the driver and fired several shots. Morales drove off, but bullets hit Caldera, Nieto and Rowan, and Caldera died of his injuries shortly thereafter.

The other victims described the car involved in the shooting as white. Los Angeles Police Officer Carlos Sanchez told detectives about a cream colored Monte Carlo owned by Kevin Lopez.

The next day or so, Gallegos (known as "Shy Boy" within his gang, Blythe Street (BST)) told fellow BST gang member Kevin Lopez (known as "Stranger") he had "fucked up" and was "responsible" for the shooting. Lopez said he did not want to hear it. Gallegos told Lopez he had a stolen car and thought the victims were from a rival

2

gang trying to do a "drop off" and a "walk-by" shooting; he told Lopez the victims were actually from "nowhere" and had said "go, go, go" before the shooting.

That same day or so, Gallegos spoke with fellow BST gang members Raul Garay, "Sneaky" and "Chico." Gallegos said, "Fuck, I fucked up." He gave Garay a 9 mm Star Brand handgun, saying he had killed someone with the gun.[1] He said he had told his "old lady" he had "smoked a fool," and she had told the police. She knew what had happened, and he was worried the police were looking for him. Garay told Gallegos to "vanish."

Angela Garcia was Gallegos's "off and on" girlfriend; he had cheated on her. Two days after the shooting, Gallegos called Rosa Gomez when Garcia was there, and she (Garcia) and Gallegos spoke. Gallegos told Garcia he and his friends had gone "gapping," which meant shooting. He identified the location at Roscoe and Willis, said someone had asked "where you from" and the victims were saying to hurry and go. Garcia knew Caldera and already knew he had died at the exact location Gallegos identified. She told Gallegos Caldera was not "from anywhere," meaning he was not from a gang, and was very upset. After that, Gallegos said it had not been him; it had been his friends.[2]

After the shooting, the police prepared several photographic lineups which included photographs of BST gang members Kevin Lopez, his brother Leon, Raul Urquiza and Gallegos. At the time, none of the victims identified Gallegos. Morales initially identified someone named David Soto, saying he looked like the shooter, and later identified Kevin Lopez, based on his eyes.

On September 11, 1991, the police interviewed Garcia, and she recounted her telephone conversation with Gallegos. She told police Gallegos lived with Kevin Lopez.

---

[1]  Garay then destroyed the gun with a grinder. He later testified at trial under a grant of immunity and said he had used the same gun six months earlier to commit a shooting from a white Cutlass with Gallegos driving; Gallegos said to "just blast" someone he thought was from a rival gang.

[2]  After that phone conversation, Garcia did not hear from Gallegos for six months.

Police served a search warrant on Lopez's residence, and arrested Kevin Lopez, his brother Leon, Urquiza and Renee Vargas.

When Detective Hooks told Kevin Lopez he had been identified as the shooter, he told police about his conversation with Gallegos who said he had "fucked up" and "committed that shooting." He told the police Gallegos was in Mexico.

After Lopez's arrest and interview, BST gang member Robert Rivera known as "Wizard" (21 at the time of the shooting) provided police with documentation (a rental agreement for a cabin) regarding a trip to Big Bear he had taken with other BST members. Rivera, accompanied by Raul Urquiza ("Boo Boo"), Leon Lopez ("Sneaky"), and Kevin Lopez ("Stranger"), left Panorama City at about 9:00 or 10:00 p.m. on August 23, 1991. Gallegos ("Shy Boy") did not go on the trip. Kevin Lopez had encouraged Gallegos ("Shy Boy") to go; they had had a dispute "over a female" and Lopez invited Gallegos to "put it behind [them]," but Gallegos declined. Urquiza and someone named Norma rode in Kevin Lopez's car. His brother Leon drove another car, and Rivera drove a third car.

At about 11:00 p.m. on August 23, they were all pulled over by police on the eastbound Interstate 10 freeway near the intersection with the Interstate 15 freeway. The police questioned the group, noting each of their names and completing field identification cards. Kevin Lopez gave a false name ("Angel Reyes") and presented a fake driver's license, but officers also photographed everyone there. According to the police, the detention lasted until 12:21 a.m. when everyone then continued on to Big Bear. The group also had receipts reflecting various purchases and rentals in Big Bear. Everyone including Kevin Lopez stayed until Sunday (August 25) when they left around noon, arriving in their neighborhood in the evening.

The police looked for Gallegos but were unable to locate him. A warrant was placed in a law enforcement database on September 19, 1991. A bulletin was distributed in the area and published in Spanish newspapers. Gallegos did not contact the police. Neither Rivera nor Urquiza who had regularly seen Gallegos in the neighborhood in the

4

past saw Gallegos again after the weekend of the shooting. Kevin Lopez did not leave the area.

In July 1999, a family friend from the same town in Mexico as Gallegos's family (Refugio Espino) learned police sought Gallegos for murder. When he later visited the town (Tarimoro), he saw Gallegos there, noted his address and provided it to police upon his return to the United States. The case had been reassigned to Detective Angel Lopez who then attempted to locate witnesses from the 1991 shooting.

In 2004, Garcia told Detective Lopez that Gallegos contacted her six months after the shooting and told her to date other people because he was not returning. Urquiza reported Gallegos had taken his belongings with him. Kevin Lopez recounted that Gallegos had said he had "fucked up and had shot the wrong person." Nieto, the rear right passenger closest to the car involved in the shooting, said he did not think he could make an identification and declined to view a lineup because he feared gang retaliation; he had also thought it to be pointless as he had seen the flyer with Gallegos's picture.

In 2005, Morales told Detective Lopez he had identified Kevin Lopez because he was unable to recognize the shooter. Detectives did not tell him who to identify, but kept pressing him to make an identification after the shooting he said.

In 2006, Detective Lopez conducted a photographic lineup with Nieto who identified Gallegos, writing: "[this picture] is known to me as Rodolfo Gallegos. When I first saw this picture, when I first saw it, it was a confirmation to my memory of the incident. I saw that picture and thought, so this is how he looks. This is the guy with the gun." He said his identification was not affected by the flyer because he had relived the shooting for the first "couple of years" afterward. Morales declined another lineup, saying he had nothing to add. In April, Detective Hooks located Raul Garay and, after speaking with him, applied for Gallegos's extradition from Mexico.

Gallegos was charged with one count of murder (Pen. Code, § 187, subd. (a) [all undesignated statutory references are to the Penal Code]) (count 1, relating to Caldera) as well as four counts of attempted premeditated murder (§§ 187, subd. (a); 664) in counts 2 through 5 (relating to Nieto, Rowan, Morales, Perez, respectively). As to all counts, it

5

was further alleged Gallegos had committed the crimes for the benefit of his criminal street gang (§ 186.22, subd. (b)(4)); had personally used a firearm (§ 12022.5, subd. (a)); was a minor at least 16 years of age at the time of each offense (Welf. & Inst. Code, § 707, subd. (d)(1)); was a minor at least 14 years of age at the time of each offense (Welf. & Inst. Code, § 707, subd. (d)(2)(B)); and was a minor at least 14 years of age at the time and the crime was committed for the benefit of a criminal street gang (Welf. & Inst. Code, § 707, subd. (d)(2)(C)(ii)).

At trial, the People presented evidence of the facts summarized above. Nieto testified he had not initially identified Gallegos because he was young (14) at the time of the shooting and had been afraid but said he was certain of his identification; he had been the closest occupant of the car to the shooter, and "it's one of those moments you do not forget."

When police reinterviewed Kevin Lopez in November 2010, he was scared and did not want to be involved, indicating the defense had contacted him. He acknowledged Gallegos had admitted committing the shooting and after hearing his interview from 1991, confirmed what he said then was true.

In addition, Detective Lopez testified as a gang expert regarding BST. Given a hypothetical based on the facts of the case, Detective Lopez opined the shootings were gang motivated as a way to tell others to stay out of the gang's territory and to garner respect.

Los Angeles Police Officer Steve Park testified that he had come into contact with Gallegos on July 25, 1990 (more than a year before the shooting). A photograph taken at the time showed that Gallegos had "BST" tattooed across his chin and had another BST tattoo on his right forearm. Gallegos told police his "homeboy" "Happy" was being "jumped," he rode in another homeboy's car with "Killer" to help "Happy."

In Gallegos's defense, an eyewitness identification expert testified as to various factors affecting reliability of eyewitness identifications. In addition, a defense investigator said Kevin Lopez had told her his statements to police were inaccurate. He had made them up because he was "terrified" of the police; he was worried about a

6

juvenile warrant and was told he would not be arrested if he cooperated. He acknowledged Gallegos told him he had "fucked up."

The jury found Gallegos guilty on all counts and found true the allegations he had used a handgun and had committed his crimes for the benefit of a criminal street gang.

The trial court sentenced Gallegos to state prison for a term of 85 years to life plus 5 years, calculated as follows: on count 1, 25 years to life for murder, plus 5 years for the firearm enhancement; on count 2 (attempted premeditated murder), a consecutive term of life as the base term, with a minimum parole eligibility period of 15 years for the gang enhancement; on counts 3, 4 and 5 (attempted premeditated murder), consecutive sentences identical to the sentence imposed on count 2.

Gallegos appeals.

## *DISCUSSION*

**Substantial Evidence Supports Gallegos's Convictions.**

According to Gallegos, the "evidence failed to prove that [he] shot at or killed anyone." He says the eyewitnesses suffered from "well-known deficiencies," the prosecution failed to produce forensic evidence to corroborate the witnesses identifications and although former BST gang members and Gallegos's girlfriend testified against him, their testimony "should be deemed unreliable." In a separate but related argument, he says "[n]either the killing nor the attempted killings were premeditated and deliberate." Gallegos ignores the standard of review as well as the record.

"The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) Nieto identified Gallegos as the shooter, and it was for the jury to assess the credibility of his explanation for his delay in doing so. In addition, as he acknowledges, fellow gang members Kevin Lopez and Raul Garay and girlfriend Angela Garcia (who testified at the time of the trial she was again "in love" with Gallegos and had been in contact with him during the proceedings) testified Gallegos had admitted the shooting, and he fled to Mexico shortly thereafter. Similarly,

7

given the evidence Gallegos followed the victims with a gun and fired at them in spite of their denials of any gang affiliation, his claim there was no evidence of premeditation and deliberation is meritless. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419-420.)

**Gallegos Has Failed to Demonstrate Prejudicial Error in the Trial Court's Admission of Tape Recorded Police Statements.**

Gallegos says he was prejudiced by the admission of the statements of Kevin Lopez and Raul Garay to police, arguing the rule of completeness set forth in Evidence Code section 356 only applies to allow the *opponent* of the admission of an out-of-court statement to seek admission in its entirety. We disagree.

At the time of trial, Kevin Lopez (who was 16 at the time of the shooting but who had left the gang a year of so later and was working as a financial manager by the time of trial) did not want Gallegos to see his face because he was afraid of retaliation. At trial, he said he could not remember "details" and did not remember which shooting Gallegos had been talking about. The prosecution argued he was feigning and sought to impeach him with his prior testimony. (Evid. Code, § 1235.) Similarly, Garay was denying "about 90 percent" of what he had previously told detectives.

Gallegos has failed to demonstrate error. (*People v. Fierro* (1991) 1 Cal.4th 173, 221-222; *People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220).

**Gallegos Has Demonstrated No Error Relating to Evidence of Uncharged Conduct.**

Gallegos says the trial court erred in allowing the prosecutor to introduce testimony from an accomplice (Raul Garay) regarding an uncharged offense without giving the jury an accomplice instruction, and his trial counsel was ineffective for failing to object. As he acknowledges, however, an accomplice is defined to mean "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Therefore, Garay was not an "accomplice" within the meaning of section 1111, and the claim is meritless.

8

**Gallegos Has Failed to Demonstrate Ineffective Assistance of Counsel for Failure to Present Evidence of his Good Character While in Mexico.**

Gallegos says he had evidence he went to Mexico to do good deeds—he taught school and showed "good behavior" which would have countered the argument he fled to escape prosecution. As the Attorney General observes, citing *People v. Freeman* (1994) 8 Cal.4th 450, 495, trial counsel may not have wished to further emphasize Gallegos's flight to Mexico, and the record does not support the conclusion there could have been no reasonable tactical reason to forego this line of inquiry. (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Gallegos's claim fails.

**Gallegos Has Failed to Demonstrate Error Resulting from the Gang Expert's Testimony.**

According to Gallegos, the trial court erred in allowing Detective Lopez's gang expert testimony. Contrary to this testimony, Gallegos says, the evidence shows he shot, if he shot, by mistake; there is no evidence he gained any respect; and witnesses snitched on him. Detective Lopez's testimony, based on the facts of the case, was proper.[3] (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

**Remand for Resentencing Is Appropriate in this Case.**

Because he was 16 at the time of the shooting, Gallegos argues, his sentence is unconstitutional.[4] We conclude the case should be remanded for resentencing in light of recent case law.

Gallegos's age (along with the ages of his victims as well as his fellow gang members) was noted repeatedly throughout the trial. In addition, in their sentencing memorandum, the People expressly acknowledged Gallegos's age at the time he committed his crimes, but emphasized the "great violence, great bodily harm, threat of

---

[3]     It follows that Gallegos's further claim of cumulative error necessarily fails.

[4]     Gallegos characterizes his sentence as a term of *6* years to life plus another 25 years to life in prison, but he misreads the record.

9

great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness" evidenced by the facts of the case, as well his flight to Mexico in avoidance of prosecution for 20 years and failure to show any remorse for the devastation he had caused served as justification for the maximum sentence.

Gallegos (represented by new trial counsel—and now appellate counsel) filed a "motion to reduce sentence based on cruel and unusual punishment," specifically arguing the sentence the People sought to impose on a 16-year-old offender (a term of 30 years plus 53 years to life in state prison) violated both the United States and California Constitutions.  First, Gallegos argued, the United States Supreme Court has consistently refused to impose the harshest sentences on juvenile offenders.  In *Roper v. Simmons* (2005) 543 U.S. 551, for example, the Supreme Court extended the prohibition against the death penalty on all juvenile offenders under the age of 18 because of the "three general differences between juveniles and adults.  First, the Supreme Court noted that '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable amount the young.  These qualities often result in impetuous and ill-considered actions and decisions.  [Citations.]'  (*Id.* at p. 569.)

"Second, '. . . juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.  [Citations.]'  Third, 'the character of a juvenile is not as well formed as that of an adult.  The personality traits of juveniles are more transitory, less fixed.  [Citations.]'  (*Id.* at p. 569.)

"'These differences render suspect any conclusion that a juvenile falls among the worst offenders.  The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." [Citations.]  Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.  [Citations.]  The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably

10

bad character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." [Citations.]' (*Id.* at p. 570.)"

Similarly, Gallegos argued, his case was analogous to *People v. Dillon* (1983) 34 Cal.3d 441, 479, in which our Supreme Court stated that, in making a determination of whether a punishment is cruel or unusual, "[w]ith respect to the offense, the court considers 'the totality of the circumstances surrounding the commission of the offense in the case at bar.' [(*Ibid.*)] Regarding the offender, courts consider his 'individual culpability as shown by factors as his age, prior criminality, personal characteristics, and state of mind.' (*Ibid.*)"

Gallegos urged the trial court his case was "analogous to *Dillon, supra,* in which the court struck down a sentence imposed on a juvenile offender. In *Dillon*, a 17-year-old with no criminal record joined a group of youths hoping to steal some marijuana grown in a nearby field. The youths knew the field was being guarded by armed men, so they armed themselves before embarking on their night-time raid. Dillon happened on one of the armed guards, and hearing gunfire, panicked and began shooting at the guard, fearing the guard would shoot him. (*Dillon, supra,* 34 Cal.3d at pp. 451-452.)

"A psychologist testified that Dillon was immature and acted without thinking, and no contrary expert testimony was presented. (*Dillon, supra,* 34 Cal.3d at p. 483.) The trial court expressed its belief that Dillon did not pose a danger to society, but notwithstanding that belief, the felony-murder rule required imposition of a first degree murder penalty. (*Id.* at pp. 485-486.) Moreover, no alternative was permitted than the most severe form of a prison sentence: Life imprisonment in state prison . . . . (*Id.* at pp. 485-487.)

"All the other coconspirators of the raid were neither convicted of any homicide nor received any prison sentence at all: They received the 'proverbial slap on the

11

wrist[,]' while Dillon received the 'heaviest penalty provided by law' at that time. (*Dillon, supra,* 34 Cal.3d at p. 488.)  Because the court's analysis of Dillon's individual culpability, background and participation led it to conclude he had been unjustifiably punished via the felony-murder rule, it reduced the conviction to second degree murder, thereby permitting Dillon to serve his sentence in CYA.  (*Id.* at p. 489.)

"All of the conditions leading the *Dillon* court to reduce the sentence in that homicide are present in Gallegos's case.  Like Dillon, Gallegos was a young gang member.  Gallegos, like Dillon, led a crime-free life.  (See Prob. Rpt. At pp. 10, 14.)  Gallegos acted immaturely and without thinking.  (See, *Dillon, supra,* 34 Cal.3d at p. 483; see also *Roper, supra,* 543 U.S. at pp. 569-570.)  The prosecution never even prosecuted the driver of the car and therefore, the driver never received any punishment.  Since the incident, Gallegos has never suffered any adult convictions.

"Like Dillon, Gallegos'[s] individual culpability, background and participation require this Court to conclude that Gallegos will be unjustifiably punished with a determinate sentence of 30 years and an indeterminate sentence of [53] years to life.  Such a sentence would violate the constitutional prohibitions against cruel and unusual punishment."

At the January 2012 sentencing hearing, the trial court heard argument on Gallegos's "motion for cruel and unusual punishment."  Gallegos's counsel reiterated: "[W]hat is so tragic about this thing is Mr. Gallegos was 16 at the time of the incident.  And I think the court recognizes how 16 year olds are vulnerable and have a lack of maturity and an underdeveloped sense of responsibility.

"They are more susceptible to negative influences and outside pressures, and I think the United States Supreme Court has recognized this.  Since this has happened, he has developed and matured into a matured human being.  [T]he issue we would like the court to consider is that . . . he is looking at a life sentence in terms of what happened.  But in fact he was a 16 year old subject to outside influences, and it's really unfortunate this happened all the way around for everybody.  And so we would like the court to consider a lesser sentence based on his background, his participation and his age.

12

[A]nything beyond a determinate sentence would be cruel and unusual[ given] the facts and circumstances of this case, Mr. Gallegos['s] lack of maturity, his young age. . . .  [¶] Basically his young age and the fact that he was impressionable and apparently got involved with the wrong people.  And so we would like the court to consider that."

The prosecutor argued Gallegos's arguments were misplaced as the proposed sentence was not a true life-without-possibility-of-parole sentence, and he was "appropriately being sentenced under California law."

After stating the court had read and considered the probation officer's report, the trial court inquired whether defense counsel wished to augment that report.  She indicated she did not believe the report acknowledged that Gallegos was teaching English at a school while he was in Mexico and submitted a letter from the school where he worked between 1992 and 2002 which "shows good behavior and that he never did get in any trouble in Mexico."  The trial court acknowledged this augmentation.

Next, the trial court heard victim impact statements from Caldera's father, mother and brother, followed by a statement from Gallegos's mother who again stressed that at the time, "[Gallegos] was still very young," "inexperienced, he was a minor."  She said he had a "very good record" when he went to Mexico and was working there and "ha[d] always been a very good son also."

The trial court denied Gallegos's motion to reduce his sentence on cruel and unusual punishment grounds.  "[B]efore I pronounce sentence in this matter, those of us who work in courts, who handle cases such as this, we all know that this is [a] tragedy, this is [a] tragedy for both sides."  The trial court further stated:  "I am convinced that all avenues regarding this matter have been explored by [Gallegos's new and current appellate] attorney who came in after the verdict was taken in this matter . . . ."

The trial court then sentenced Gallegos to state prison for a term of 85 years to life plus 5 years, calculated as follows:  on count 1 (Caldera's murder, committed for the benefit of Gallegos's gang), a term of 25 years to life, plus an additional and consecutive term of 5 years for the firearm enhancement, and on counts 2 through 5 (four attempted premeditated murder counts, with true findings on the gang allegations), four consecutive

13

terms of life with the possibility of parole (consecutive to count 1 and consecutive to each other), with minimum parole eligibility periods of 15 years on each of the four attempted murder counts. The trial court reiterated: "It's the intent of the court imposing the full sentence, the defendant shall serve the determinate term of five years plus life with the possibility of parole, the aggregate total minimum parole eligibility period which is [60] years plus 25 years to life."

On appeal, Gallegos raises the same arguments, adding that in *Graham v. Florida* (2010) __ U.S. __ [176 L.Ed.2d 825] the United States Supreme Court concluded the Eight Amendment prohibits the imposition of a life sentence without possibility of parole for a juvenile offender who did *not* commit homicide, noting "No recent data provide reason to reconsider the Court's observations in *Roper*[, *supra,* 543 U.S. 551] about the nature of juveniles. [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. . . . Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are actions of adults. *Roper,* 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.' *Ibid*. These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.

"The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. [Citations.] There is a line 'between homicide and other serious violent offenses against the individual.' [Citations.] Serious nonhomicide crimes 'may be devastating in their harm . . . but "in terms of moral depravity and of the injury to the person and to the public," . . . they cannot be compared to murder in their "severity and irrevocability." [Citations.] This is because '[l]ife is over for the victim of the murderer,' but for the victim of even a very serious nonhomicide crime, 'life . . . is not over and normally is not beyond repair.' [Citation.] Although an offense like robbery or

14

rape is 'a serious crime deserving serious punishment, [citation], those crimes differ from homicide crimes in a moral sense.

"It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Graham v. Florida, supra,* 560 U.S. at pp. __, 130 S.Ct. at pp. 2026-2027.) *Graham* was careful to distinguish and did not address life sentences for juveniles like Gallegos who do commit homicide.

In addition, Gallegos now cites *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455, 2475] (*Miller*), in which the Supreme Court recently determined *mandatory* life-without-possibility-of-parole sentences for juvenile offenders who commit homicide violate the Eighth Amendment's ban on cruel and unusual punishment, emphasizing the necessity for "*the opportunity to consider* mitigating circumstances before imposing the harshest possible penalty for juveniles." (Italics added.)

The *Miller* court explained: "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' *Graham*, 560 U.S., at ___, 130 S. Ct. 2011, 176 L. Ed. 2d 825. Those cases relied on three significant gaps between juveniles and adults. First, children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1. Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' *Id*., at 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1." (*Miller, supra,* 132 S.Ct. at p. 2464.)

15

"[N]one of what *Graham* said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. (*Miller, supra,* 132 S.Ct. at p. 2465.) "Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." (*Ibid.*) "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws [at issue in *Miller*] prohibit a sentencing authority from assessing whether the law's harshest terms of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juveniles offenders cannot proceed as though they were not children." (Id. at p. 2466.)

In addition, "*Graham*'s '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment," [citation], makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty." (*Miller, supra,* 132 S.Ct. at p. 2467.) "Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the 'mitigating qualities of youth.' [Citation.] Everything we said in *Roper* and *Graham* about that stage of life also appears in these decisions." (*Ibid.*) "'[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability. [Citation.]" (*Id.* at p. 2468.)

"In light of *Graham*'s reasoning, these decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other--the 17-year-

16

old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one.  And still worse, each juvenile (including these two 14-year-olds [the defendants in *Miller*]) will receive the same sentence as the vast majority of adults committing similar homicide offenses--but really, as *Graham* noted, a greater sentence than those adults will serve." (*Miller, supra,* 132 S.Ct. at pp. 2467-2468, footnote omitted.)

"So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult.  To recap:  Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his to assist his own attorneys.  [Citations.]  And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 132 S.Ct. at p. 2468.)

"We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller, supra,* 132 S.Ct. at p. 2469, citation omitted.)  "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Ibid.*)  The *Miller* court emphasized:  "[O]ur decision today retains the[e] distinction [between homicide and nonhomicide cases]:

17

*Graham* established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." (*Id.* at p. 2466, fn. 6.)

In *People v. Caballero* (2012) 55 Cal.4th 262, 265 (*Caballero*), the California Supreme Court considered whether a 110-year-to-life sentence imposed on a juvenile convicted of nonhomicide offenses contravenes *Graham*'s mandate against cruel and unusual punishment under the Eighth Amendment and concluded that it does. In *Caballero*, the Attorney General had argued *Graham*'s ban on life without parole sentences does not apply to juvenile offenders who commit attempted murder, with its requisite intent to kill and that a cumulative sentence for distinct crimes could not constitute an Eighth Amendment violation because each sentence was permissible individually where each included the possibility of parole within the defendant's lifetime. (*Id.* at p. 267.) The *Caballero* court rejected both arguments. (*Id*. at pp. 267-268.)

"In *Miller*, the United States Supreme Court extended *Graham*'s reasoning (but not its categorical ban) to homicide cases, and, in so doing, made it clear that *Graham*'s 'flat ban' on life without parole sentences for juvenile offenders in nonhomicide cases applies to their sentencing equation regardless of intent in the crime's commission, or how a sentencing court structures the life without parole sentence. (*Miller*, *supra*, 567 U.S. at pp. ___, ___ [132 S. Ct. at pp. 2465, 2469].) The high court was careful to emphasize that *Graham*'s 'categorical bar' on life without parole applied 'only to nonhomicide crimes.' (*Id*. at p. ___ [132 S. Ct. at p. 2465].) But the court also observed that 'none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.' (*Miller*, *supra*, 567 U.S. ___ [132 S. Ct. at p. 2465].) *Miller* therefore made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the *functional equivalent* of a life without parole sentence imposed in this case." (*Caballero, supra,* 55 Cal.4th at

18

pp. 267-268.) The *Caballero* court expressly acknowledged that *Miller* requires sentencers in *homicide* cases 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) *We leave* Miller*'s application in the homicide context to a case that poses the issue.*)"[5] (*Caballero, supra,* 55 Cal.4th at p. 268, fn. 4, italics added.)

Gallegos's sentencing predated *Miller, supra,* 567 U.S. __ [132 S.Ct. 2455], and *Caballero, supra,* 55 Cal.4th 262. Although the record establishes defense counsel argued the trial court should consider the factors distinguishing juvenile offenders from adult offenders as discussed in *Roper, supra*, 543 U.S. 551, because *Roper* concerned imposition of the death penalty for juvenile offenders, we cannot conclude the trial court recognized the significance for sentencing purposes of Gallegos's youth (and all that accompanies youth) in imposing the "functional equivalent" of a life without possibility of parole sentence. In light of the Supreme Court's admonition that a sentence of life without possibility of parole is to be imposed on "the *rare* juvenile offender whose crime reflects *irreparable corruption*," (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2469], italics added), we are persuaded the preferred course in this case is to remand the matter so the trial court will have the opportunity to reconsider its sentence in light of *Miller*.

---

[5] The California Supreme Court recently granted review in two cases to consider whether a sentence of life without parole imposed on a juvenile offender under section 190.5, subdivision (b) violates the Eighth Amendment under *Miller*. (*People v. Moffett,* review granted Jan. 3, 2013, S206771; *People v. Gutierrez,* review granted Jan. 3, 2013, S206365.)

19

## *DISPOSITION*

The judgment is affirmed.  The case is remanded for resentencing consistent with the views expressed in this opinion.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**

20